UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
ANDERSON/GREENWOOD DIVISION

| | | |
|---|---|---|
| Teresa Davis, | ) | |
| | ) | C/A No.: 8:10-cv-03078-GRA |
| Plaintiff, | ) | |
| | ) | **ORDER** |
| v. | ) | (Written Opinion) |
| | ) | |
| Hartford Life and Accident Insurance | ) | |
| Company, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## I.    INTRODUCTION

This matter comes before the Court on Teresa Davis' ("Davis") action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001–1461 (2000 & Supp. 2012). This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and other relevant statutes. The question before the Court is whether Hartford Life and Accident Insurance Company ("Hartford") abused its discretion in denying Plaintiff's claim for waiver of premium benefits that she is allegedly entitled to as a participant of a life insurance policy issued and administered by Hartford. Pending before the Court are the parties' cross motions for summary judgment, *see* ECF Nos. 24 & 25.[1] Having carefully considered the record and applicable law, it is the opinion of this

_____

[1] On cross-motions for summary judgment, "each motion [is] considered individually, and the facts relevant to each [are] viewed in the light most favorable to the non-movant." *Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003).

Court that the question must be answered in the affirmative, and thus, judgment will be entered for Plaintiff.

## II. FINDINGS OF FACT

### A. Relevant Provisions of the Plan

Davis brings this action against Hartford, alleging that Hartford wrongfully denied her claim for waiver of premium benefits on a life insurance policy issued by Hartford after she was "forced to quit her job due to her medical conditions." Pl. Mot. at 4, ECF No. 25. Davis is a former employee at Family Christian Store, Inc. ("Family Christian Stores") Family Christian Stores established an employee welfare benefit plan to provide life insurance coverage ("Plan") to eligible employees. Hartford insured the life insurance provided under the Plan through policy, No. GL-674480 ("Policy"), which included a Waiver of Premium benefit. *See* J.A. at 23–51, ECF No. 23.[2] Under the Plan and Policy, Family Christian Stores vested Hartford with authority to interpret plan terms and make benefit determinations. Thus, Hartford administers, pays claims, and makes determinations of eligibility.

The Plan includes a Waiver of Premium benefit, which allows a participant to continue coverage under the Policy without paying the premium, if the participant is disabled and qualifies under the following terms:

---

[2] Citations to "J.A." refer to the contents of the Administrative Record in this case.

> To qualify for Waiver of Premium You must:
>
> 1) be covered under The Policy and be under age 60 when You become Disabled;
>
> 2) be Disabled and provide Proof of Loss that You have been Disabled for 9 consecutive month(s), starting on the date You were last Actively at Work; and
>
> 3) provide such proof within one year of Your last day of work as an Active Employee.

*Id.* at 36. Under the Policy, a participant is deemed Disabled only if the participant cannot perform "any work." *Id.* at 35–36. The Plan states, "*Disabled* means You are prevented by injury or sickness from doing *any work* for which You are, or could become, qualified by: 1) education; 2) training; or 3) experience. . . ." *Id.* at 35 (emphasis added).

Davis ceased working on November 12, 2008 due to her physical condition, and subsequently applied for and was initially approved for Waiver of Premium benefits.[3] Hartford later denied her claim for Waiver of Premium benefits on September 17, 2009 after determining that Davis was capable of sedentary work, and thus no longer met the Plan's definition of disabled. *See* J.A. at 24–28, ECF No. 19. Davis challenges this determination and maintains that she is not capable of any work, or in the alternative that the term "any

---

[3] Davis also received long term disability benefits from Hartford under the Own Occupation definition of disability, which is a different standard from the definition of disability applicable in the matter *sub judice*.

work" refers to only full-time work, and does not include sedentary, part-time work.[4]  *See* ECF No. 25.

### B. Davis' Work Information

Davis, who is currently forty-six years old, was employed as a Store Manager for Family Christian Stores for approximately nine years.   A Store Manager at Family Christian Stores is "[p]rimarily responsible for managing the overall store operation, including supervision of partners and the administration of store sales performance and profitability objectives."   J.A. at 130, ECF No. 20.   Furthermore, the Physical Demands Analysis for a Store Manager indicated that, although the job allowed breaks, it was eight hour per day job, which required the ability to stand for up to six hours at a time, frequently push, pull, lift and carry boxes weighing up to thirty pounds as far as twenty feet,[5] and the ability to frequently reach, handle, and use one's fingers. *See id.* at 128–30.  As a benefit of her employment, Davis was covered by a group life insurance policy issued by Hartford, which is at issue in this case.   Davis stopped working for Family Christian Stores on November 12, 2008, complaining of lower back pain radiating down her left leg.

---

[4] Since this Court finds that Davis is not capable of any work, full-time or part-time, it will not address Plaintiff's alternative argument in detail.   However, this Court notes that the instant policy's definition of the term "disabled" does not differentiate between full-time and part-time work.  The Court concludes that the phrase unambiguously encompasses all occupations whether full-time or part-time. *See Donnell v. Metro. Life Ins. Co.*, 165 F. App'x 288, 293 (4th Cir. 2006) (holding that the phrase "any gainful work or service" encompasses "all work performed for income, without regard to whether it is performed full or part-time").

[5] The typical box was two pounds.  *See* J.A. at 128–30, ECF No. 20.

*C. Davis' Medical Records*

### 1. Dr. Michael Bucci

The Administrative Record reveals that, on July 17, 2004, Davis underwent back surgery with Dr. Bucci of Piedmont Neurolosurgical Group, P.A. involving a L5 laminectomy and discectomy to repair a ruptured herniation in her lumbar spine. *See* J.A. at 66–68, ECF No. 22. According to Dr. Bucci's August 19, 2004 notes, the surgery appeared to have improved Davis' back pain. *Id.* at 69.

Four years later, however, on November 6, 2008, Davis went to St. Francis Hospital complaining of severe back pain radiating down her left leg and numbness. *See id.* at 84–88.[6] Davis ultimately stopped working on November 12, 2008 due to her back pain, but she continued to be treated by doctors at Pain Management Associates and Neurology Associates of Greenville, P.A., in an attempt to improve her condition. Davis also applied for and was initially approved for her Waiver of Premium benefits.[7]

After Davis' hospital visit, Dr. Bucci of Piedmont Neurosurgical Group, PA, performed an MRI on November 18, 2008, which found "[m]oderate L5-S1 disc degeneration and disc bulge." *See id.* at 94–97. At a follow-up appointment on November 25, 2008, Dr. Bucci decided that he was unable to help Davis further

---

[6] Dr. Bucci noted that Davis's symptoms had been present since November 6, 2008 in his "History and Physical Report" dated November 25, 2008. *See* J.A. at 57, ECF No. 21.

[7] Davis also received long term disability benefits from Hartford under the Own Occupation definition of disability, which is a different standard from the definition of disability applicable in the matter *sub judice*.

and referred her to Pain Management Associates ("Pain Management") for treatment. *See id.* at 107–14. Dr. Bucci further recommended that Davis remain out of work until her appointment with Pain Management on January 5, 2009. *Id.*

### 2. Pain Management Associates – Dr. Holdren & Dr. Thiyaga

After the referral, Davis met with Dr. Holdren of Pain Management on January 5, 2009, for an informational meeting regarding treatment and managing Davis' pain through medication. *See* J.A. at 80–82, ECF No. 20.

On January 8, 2009, Davis met with Dr. Thiyaga of Pain Management who recommended Davis have a transforaminal epidural steroid injection at L5/S1. *See* J.A. at 99–102, ECF No. 21. On January 12, 2009, Davis met with Dr. Thiayaga for the injection. *See id.* at 103–04.

Davis returned to Dr. Holdren on February 4, 2009, who devised a plan for Davis to begin working again and prescriptions for pain medication. *See* J.A. at 83–86, ECF No. 20.

On February 9, 2009, Davis met with Dr. Thiyaga, because she did not benefit from the injection and did not feel comfortable undergoing spinal cord stimulation. *See* J.A. at 109–12, ECF No. 21. It was decided that Davis would continue being treated by Dr. Holdren with chronic pain medication. *Id.*

On March 4, 2009, Davis met with Dr. Holdren, who continued Davis' prescription plan and reported that Davis was out of work "until further notice" or until the next appointment. Dr. Holdren also restricted Davis' movements,

stating that Davis "may not sit or stand in one position for more than 15 to 20 minutes. No Bending, Stooping, Twisting, Lifting, Kneeling, or Crouching." J.A. at 87–91, ECF No. 20.

On March 18, 2009, Dr. Holdren completed an Attending Physician's Statement form for Hartford in which she restricted Davis to sitting for one hour, for a total of eight hours; standing for thirty minutes, for a total of four hours; and walking for fifteen minutes, for a total of two hours.[8] *See id.* at 99–100.

Davis met with Dr. Holdren on April 29, 2009, at which time Dr. Holdren continued Davis' prescription plan and provided that Davis was out of work until further notice and until her next appointment. *See* J.A. at 118–22, ECF No. 21. At this time, Davis' activities included cleaning house and errands. Dr. Holdren limited Davis to sitting or standing for no longer than fifteen to twenty minutes and changing position every fifteen to twenty minutes. *Id.*

On May 4, 2009, Dr. Holdren completed a second Attending Physician's Statement for Hartford and provided that Davis was restricted to sitting for one hour, for a total of eight hours; standing for thirty minutes, for a total of four hours; and walking for fifteen minutes, for a total of two hours. *See* J.A. at 71–72, ECF No. 20.

---

[8] The Court noticed a sheet entitled "Functional Capabilities" that Dr. Holdren apparently filled out on March 18, 2009, where she wrote "Out of Work" over the block for hours Davis could sit, stand, or walk and amount of weight Davis could lift. *See* J.A. at 115, ECF No. 20. This sheet appears out of order and it is not clear what its significance is, but it does indicate ambiguity between the limitations Dr. Holdren set for Davis.

On May 27, 2009, Davis met with Dr. Holdren, who continued Davis'
prescription plan and provided that Davis was out of work until further notice
and until her next appointment. *See* J.A. at 124–28, ECF No. 21. Davis listed
her activities as housework and walking. *Id.* She also informed Dr. Holdren that
she was not a surgical spine candidate according to Dr. Bucci. *Id.* Dr. Holdren
limited Davis to sitting or standing for no longer than fifteen to twenty minutes
and changing position every fifteen to twenty minutes. *Id.*

On July 31, 2009, Davis met with Dr. Holdren, who continued Davis'
prescription plan and wrote that Davis was out of work until further notice and
until her next appointment. *See id.* at 134–39. Davis listed her activities as
housework and swimming. Dr. Holdren limited Davis to sitting or standing for no
longer than fifteen to twenty minutes and changing position every fifteen to
twenty minutes. *Id.*

On August 31, 2009, Davis met with Dr. Holdren, who continued Davis'
prescription plan and reported that Davis, who had been out of work since
November, 2008, did not feel able to return to work even light duty work, and
was out of work until her next appointment. *See id.* at 140–44. Dr. Holdren
examined Davis for arthritis after Davis complained that her hands were getting
stiffer, and limited Davis to sitting or standing for no longer than fifteen to
twenty minutes and changing position every fifteen to twenty minutes. *Id.*

On October 12, 2009, Davis met with Dr. Holdren who reviewed the
Functional Capacity Exam ("FCE") and stated, "FCE showed sedentary level

cannot return to former job . . . . Disabled per FCE . . . ." *Id.* at 145–49. Dr. Holdren concluded that, based on the FCE, Davis was "unable to do any prolonged tasks-sedentary," and Davis' disability was "Permanent Total-8 weeks." *Id.* at 149.

On April 14, 2010, Dr. Holdren completed a detailed Medical Source Statement for Davis describing Davis' condition and symptoms, reporting that Davis was severely limited in her ability to handle work stress, limiting Davis' activities to sitting or standing for fifteen minutes, for a total of one hour a day, and requiring that Davis use a cane to assist her ability to walk at all times. *See* J.A. at 69–75, ECF No. 19. Dr. Holdren reported that Davis would likely be absent from work for medical reasons more than three times per month. *Id.*

### D. Employment Analysis Report

On July 2, 2009, Hartford had an Employability Analysis Report conducted for Davis "for the purpose of determining her current employability." J.A. at 35–49, ECF No. 20. The report was based on the May 4, 2009 Attending Physician's Statement of Continued Disability by Dr. Holdren, which indicated Davis was "capable of sitting 8 hours/day (1 hour at a time); standing 4 hours/day (30 minutes at a time); and walking 2 hours/day (15 minutes at a time)." *Id.* at 35. The report concluded that, given Davis' physical restrictions and skills, the Employability Analysis identified that there were no occupations within the 'closest to good' levels, sixteen occupations within the 'fair' level and eight occupations within the 'potential' level." *Id.* at 36. Among the viable

employment matches were a school bus monitor, a case aide, and an information clerk. *Id.* The report did not indicate why it only relied on the one Attending Physician's Statement over the majority of medical records indicating the Davis' condition limited her to sitting for one hour, for a total of eight hours; standing for thirty minutes, for a total of four hours; and walking for fifteen minutes, for a total of two hours. As discussed below, this Employment Analysis Report is flawed because it relied on the restrictions set by Hartford, rather than the restrictions that the majority of the record supports.

E.  *Functional Capacity Evaluation*

On September 22, 2009, TrVera L. Williams ("evaluator") at Serenity Rehab and Wellness Center conducted a Functional Capacity Exam ("FCE") on Davis. *See* J.A. at 76–85, ECF No. 19. The purpose of the FCE was "to assess the evaluee's work capacity." *Id.* at 85. After conducting the FCE, the evaluator noted that Davis gave a "reliable effort," but was able to sit for only five minutes, stand for only ten minutes, and was unable to complete the tasks of walking, stooping, kneeling, and squatting. *Id.* The evaluator concluded, "According to the FCE results the evaluee is Sedentary . . . . *Based on these results she would be unable to return to any job at this time*." *Id.* (emphasis added).

F.  *Hartford Denies the Claim*

On September 17, 2009, Hartford denied Davis' claim for Wavier of Premium benefits after determining that Davis was capable of sedentary work,

and therefore, she could not establish that she was disabled from doing "any work," as required by the Policy. *See id.* at 24–28. In reaching its decision, Hartford reviewed several pieces of evidence, which are set forth in the administrative record. *Id.* at 26–27. Hartford specifically mentioned the following: (1) the Attending Physician's Statements completed by Dr. Rebecca Holdren, on March 18, 2009 and May 4, 2009;[9] (2) the office visit notes by Dr. Bucci from Piedmont Spine and Neurosurgical Group, P.A., dated November 6, 2008 through November 18, 2008;[10] and (3) the office visit notes by Dr. Rebecca Holdren, pain management specialist at Pain Management Associates, dated January 15, 2009 through April 29, 2009.[11] *Id.* Hartford concluded that the record revealed that Davis was capable of performing "part time light sedentary work" in that she "could sit for 1 hour at a time, 8 hours per day; stand 30 minutes at a time, 4 [hours] per day; walk 15 minutes at a time, 2 [hours] per day; and no lifting or carrying over 20 pounds." *Id.* at 27. Notably, Hartford cited only to Dr. Holdren's two Attending Physician's Statements to

---

[9] *See* J.A. at 71–72, 99–100, ECF No. 20.

[10] After extensively reviewing the administrative record in this case, the Court could not find any office records by Dr. Bucci between the dates of November 6–18, 2008 as stated in Hartford's Denial of Claim. *See* J.A. at 26, ECF No. 19. The Court found only the records from St. Francis Hospital, dated November 6, 2008, for Davis' hospital visit for severe back pain, *see* J.A. at 84–88, ECF No. 22; the Appointment Request where Davis' husband called on November 10, 2008, to make an appointment with Dr. Bucci, *see id.* at 91–92; and the MRI ordered by Dr. Bucci on November 18, 2008, *see id.* at 94–95. The only record of an appointment Davis had with Dr. Bucci was on November 25, 2008, at which time, Dr. Bucci referred Davis to Pain Management Associates for treatment and indicated Davis should remain out of work until her appointment with Pain Management on January 5, 2009. *See id.* at 64–69.

[11] Similarly, after extensively reviewing the administrative record, the Court found records of Davis' appointment with Dr. Holdren of Pain Management from January 5, 2009 through October 12, 2009. *See* J.A. at 80–91, ECF No. 20; J.A. at 99–149, ECF No. 21.

support its conclusion and did not explain its reasoning for crediting these two statements over the majority of medical records from Pain Management by Dr. Holdren, Dr. Thiyaga, and Dr. Bucci, or the findings from the FCE.

  G.     *Independent Review of the Claim*

As part of the independent review of Davis' claim on appeal, Hartford had Dr. Suresh Mahawar of University Disability Consortium review all of the medical records provided by Hartford.  He did not personally examine Davis and did not interview any of her doctors as part of his review.  On October 29, 2010, Dr. Mahawar produced a Medical Record Review, summarizing the record and concluding that Davis "should have the capacity to work in a sedentary occupation, part-time . . . ."  *See* J.A. at 45–52, ECF No. 19.  Dr. Mahawar appears to rely primarily on the two Attending Physician's Statements that Dr. Holdren sent to Hartford and Davis' MRI from November 18, 2008.  *Id.* at 50–52.  Dr. Mahawar did not provide any explanation for crediting Dr. Holdren's two Attending Physician's Statements over all of Dr. Holdren's medical records from her examinations of Davis or the Functional Capacity Evaluation conclusion that Davis could not return to any job.

  H.     *Hartford Denies the Appeal*

On October 29, 2010, Hartford denied Davis' appeal of its earlier decision in a detailed letter.  *See id.* at 12–15.  In addition to the evidence listed in the initial claim denial letter, dated September 17, 2009, and Davis' letter of appeal,

Hartford purportedly based its decision on the following in reviewing Davis' appeal:

> (1) Records from Dr. Matthew Rohers/Williamston Family Medicine;
>
> (2) Records from Dr. A. [Thiyaga]/Pain Management Associates;
>
> (3) Records from Dr. Michael Bucci/Piedmont Neurosurgical Group, PA.;
>
> (4) Records from Serenity Rehab and Wellness Center, dated September 22, 2009;
>
> (5) Medical Source Statement completed by Dr. Rebecca Holdren, MD, dated April 14, 2010;
>
> (6) Affidavit of Teresa Davis;
>
> (7) Independent medical record review conducted by Suresh Mahawar, MD, Board Certified in Physical Medicine & Rehabilitation and Internal Medicine.[12]

*Id.* at 13.

However, in explaining its reasoning for denying Davis' appeal, Hartford refers only to the independent medical review by Dr. Mahawar. In fact, Hartford's analysis mainly consists of a single block quote from Dr. Mahawar's report. Hartford does not explain why it only relied on Dr. Mahawar's Report, or why it credited the report over the majority of medical records indicating that Davis was completely disabled.

---

[12] Hartford did not interview Dr. Roehrs or Dr. Holdren.

III.    **STANDARD OF REVIEW**

A court's review of a plan administrator's benefits decision follows a *de novo* standard unless the plan provides otherwise. *Haley v. Paul Revere Life Ins. Co.*, 77 F.3d 84, 89 (4th Cir. 1996) ("[I]f the plan administrator's decision falls within the scope of the administrator's contractually conferred discretion, the court may review the merits of an administrator's decision only for an abuse of discretion."). When, as in this case, "an ERISA benefit plan vests discretionary authority to make benefits eligibility determinations with the plan administrator, the court evaluates a denial of benefits under an abuse of discretion standard." *White v. Eaton Corp. Short Term Disability Plan*, 308 F. App'x 713, 716 (4th Cir. 2009); *see also Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 111 (2008); *Champion v. Black & Decker (U.S.) Inc.*, 550 F.3d 353, 358 (4th Cir. 2008). The Plan provides, and the parties do not dispute, that Hartford, shall have "full discretion and authority to determine eligibility for benefits and to construe and interpret all terms and provisions of the Policy." J.A. at 45, ECF No. 23. Accordingly, this Court reviews Hartford's determination under an abuse of discretion standard.

Under this standard, a benefits decision will not be disturbed if it is reasonable, even if the reviewing court would have come to a different conclusion independently. *See Smith v. Cont'l Cas. Co.*, 369 F.3d 412, 417 (4th Cir. 2004). It is the claimant's burden to demonstrate his entitlement to benefits under the Plan. *Elliott v. Sara Lee Corp.*, 190 F.3d 601, 603 (4th Cir.

1999). "A plan administrator's decision is considered reasonable 'if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence.'" *Johnson v. Michelin N. Am.*, 658 F. Supp. 2d 732, 741 (D.S.C. 2009) (citing *Ellis v. Metro. Life. Ins. Co.*, 126 F.3d 228, 232 (4th Cir. 1997)). Substantial evidence is the quantum and quality of relevant evidence that is more than a scintilla but less than a preponderance and that "which a reasoning mind would accept as sufficient to support a particular conclusion." *English v. Shalala*, 10 F.3d 1080, 1084 (4th Cir. 1993) (citations omitted); *see also Hensley v. Int'l Bus. Machs. Corp.*, 123 Fed. App'x 534, 537 (4th Cir. 2004) (citations omitted).

In evaluating the reasonableness of a fiduciary's discretionary decision, the Fourth Circuit has identified the following eight factors, among others, that a court may consider in the "abuse of discretion" analysis:

> (1) the language of the plan;
>
> (2) the purposes and goals of the plan;
>
> (3) the adequacy of the materials considered to make the decision and the degree to which they support it;
>
> (4) whether the fiduciary's interpretations was consistent with other provisions in the plan and with earlier interpretations of the plan;
>
> (5) whether the decision making process was reasoned and principled;
>
> (6) whether the decision was consistent with the procedural and substantive requirements of ERISA;

(7) any external standard relevant to the exercise of discretion; and

(8) the fiduciary's motives and any conflict of interest it may have.

*Booth v. Wal-Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335, 342–43 (4th Cir. 2000); *Williams v. Metro. Life Ins. Co.*, 609 F.3d 622, 630 (4th Cir. 2010).

A conflict of interest exists where a plan administrator serves the dual role of evaluating claims for benefits and paying the claims. *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 112 (2008). A conflict of interest does not change the standard of review from the deferential view normally applied, but a court must "review the merits of the interpretation to determine whether it is consistent with an exercise of discretion by a fiduciary acting free of the interests that conflict with those of the beneficiaries." *Booth*, 201 F.3d at 342–43 (citing *Bedrick v. Travelers Ins. Co.*, 93 F.3d 149, 152 (4th Cir. 1996)). Thus, although the plan administrator's decision is still reviewed for an abuse of discretion in these circumstances, "this deference will be lessened to the degree necessary to neutralize any untoward influence resulting from the conflict." *Ellis v. Metro. Life. Ins. Co.*, 126 F.3d 228, 233 (4th Cir. 1997). Furthermore, "whenever a plan administrator employs its interpretive discretion to construe an ambiguous provision in favor of its financial interest, that fact may be considered as a factor weighing against the reasonableness of its decision." *Carden v. Aetna Life Ins. Co.*, 559 F.3d 256, 261 (4th Cir. 2009).

Courts may not "impose on plan administrators a discrete burden of explanation when they credit *reliable* evidence that conflicts with a treating physician's evaluation," and the Plan is not required to give special weight to a treating physician's opinion. *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003) (emphasis added). The absence of explanation alone does not show an abuse of discretion; however, the Plan "may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." *Id.* at 834; *see also Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315, 326 (4th Cir. 2008) (holding that there was not an abuse of discretion because the administrator addressed the evidence in claimant's favor thoughtfully and thoroughly); *Donovan v. Eaton Corp. Long Term Disability Plan*, 462 F.3d 321, 329 (4th Cir. 2006) (finding that the administrator's "wholesale disregard" of claimant's treating physician's affidavit was unreasonable, and its decision to terminate benefits was an abuse of discretion). Admittedly, it is not an abuse of discretion for an administrator to adopt the reasonably formed opinion of one doctor over another, but when the adopted opinion has fundamental flaws, summary judgment in favor of a plan administrator is inappropriate. *See White v. Eaton Corp. Short Term Disability Plan*, 308 F. App'x 713, 719–20 (stating that the denial of the claim was an abuse of discretion when the plan relied on the "fundamentally flawed" functional capacity evaluation and failed "to seriously engage in a discussion of [the plaintiff's] favorable evidence").

## IV.    DISCUSSION

Hartford claims that it did not abuse its discretion in its decision to deny Davis' claim by concluding that Davis was not disabled, and that its decision was the result of a deliberate, principled reasoning process.    However, after thoroughly reviewing the record and parties' arguments, this Court concludes that Hartford abused its discretion by denying Davis a waiver of life insurance premiums because its decision was unreasonable.

In the denial of Davis' appeal, Hartford cited to the independent review conducted by Dr. Mahawar, the two Attending Physician Statements submitted by Dr. Holdren in March and May of 2009, and the MRIs that Davis had in 2000, 2001, 2004, and November of 2008.    J.A. at 12–15, ECF No. 19.    Notably, all of the evidence cited by Hartford in its reasoning for denying the appeal was in the form of two large block quotes from Dr. Mahawar's report.    *Id.* at 14–15. Hartford's primary reliance on Dr. Mahawar's independent review in denying Davis' appeal is noteworthy because the review was flawed and clearly erroneous on its face.    As detailed below, although Hartford purportedly reviewed the entire record in reaching its decision, Hartford never seems to recognize, much less attempt to reconcile, the internal contradictions and blatant misstatements of the record contained in Dr. Mahawar's review, which it quotes at length.

First, Dr. Mahawar's summary of Dr. Holdren's reports regarding Davis is misleading on its face.    He omits some of Dr. Holdren's examinations of Davis,

which limited her to sitting or standing for ten to fifteen minutes. Dr. Mahawar does not explain why he omitted these evaluations, nor does he attempt to reconcile any of the other evidence that contradicts his conclusion other than conclusively dismissing the restrictions as "unreasonable and excessive." *Id.* at 51.

Second, Dr. Mahawar erroneously summarizes the records from Dr. Holdren's October 12, 2009 examination of Davis and review of the FCE results. Dr. Mahawar stated, "[Dr. Holdren's] examination was unchanged. FCE concluded that she is able to do sedentary work and unable to do any prolonged tasks. On 10/13/2009, Dr. Holdren did an addendum stating she is permanently unable to work." *Id.* at 49. In contrast, the records from Dr. Holdren's October 12, 2009 examination reveal that Dr. Holdren examined Davis and reviewed the results of the FCE noting that the "FCE showed sedentary level." J.A. at 145, ECF No. 21. Dr. Holdren reported that the FCE found Davis had given a reliable effort during the FCE and that she was totally disabled. *Id.* Dr. Holdren concluded that Davis' disability was "Permanent Total" and eventually filed an addendum to the Evaluation clarifying her findings, which stated, "Permanent Disability." *Id.* at 149.

Further, Dr. Mahawar's summary of Dr. Holdren's October 12, 2009 examination is fundamentally flawed in that it purports to show that the FCE found Davis capable of sedentary work, and that Dr. Holdren inexplicably changed her position regarding Davis' disability in the same report. In Hartford's

denial of Davis' appeal, Hartford not only fails to recognize this error, it directly quotes the misrepresentation in Dr. Mahawar's report: "In [October 2009], Dr. Holdren concluded that she is able to do sedentary work but in the same month concluded that she is permanently unable to work." J.A. at 14, ECF No. 19 (quoting Dr. Mahawar's independent review, *id.* at 51). This illustrates how Hartford abused its discretion by using only the parts of the record that were most beneficial to its position, even when those sections misrepresented the facts it cited to in the record, and despite the majority of the record indicating otherwise.

Third, Dr. Mahawar also incorrectly stated the results of the FCE in his independent review. Dr. Mahawar stated in his independent review that the "FCE evaluation concluded that [Davis] is capable of working at sedentary work." *Id.* at 50. In contrast, Serenity Rehab & Wellness Center, LLC, who conducted the FCE, concluded:

> According to the FCE results the *evaluee is Sedentary*. She was unable to perform any tasks constantly. She demonstrated decreased AROM (active range of motion) for her cervical spine, lumbar spine and bilateral legs. There w[ere] also limitations in strength being below normal 5/5 rating for bilateral lower extremities also. *Based on these results she would be unable to return to any job at this time*.

*Id.* at 85 (emphasis added). Thus, Dr. Mahawar's statement of the facts regarding the FCE was also blatantly misleading and erroneous. Similarly,

Hartford fails to recognize this error in its denial of Davis' appeal, but substantially relies on Dr. Mahawar's report. *See id.* at 12–15.

The examples discussed above show that Dr. Mahawar's report was incomplete and based on fundamental errors in his recitation of the record. These flaws in Dr. Mahawar's report, which were adopted by Hartford, cause it to be an unreliable basis for determining Davis' ability to work. Furthermore, there is a substantial issue as to whether Hartford properly considered Davis' claim. Hartford failed to explain why it credited Dr. Mahawar's report in spite of the errors and substantial evidence in the record to the contrary. Such a "conclusory and incomplete report does not meet the quantum of evidence that a reasoning mind would accept as sufficient to support a particular conclusion." *Hardt v. Reliance Std. Life Ins. Co.*, 540 F. Supp. 2d 656, 662–63 (E.D. Va. 2008). Plan administrators may not arbitrarily refuse to credit a claimant's reliable evidence, *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834 (2003), and in the absence of justification, disregarding such evidence may indicate an abuse of discretion. *See Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 118 (2008).

Therefore, this Court finds there is evidence that Hartford's decision to deny Davis' claim was an abuse of discretion because it was based on incomplete or erroneous evidence and not the product of deliberate, principled reasoning process or supported by substantial evidence. In denying Davis' claim, Hartford appears to have simply adopted the favorable findings of Dr. Mahawar

without engaging in a fair and searching process of its own. Thus, viewing the evidence in the light most favorable to Davis, summary judgment in Hartford's favor is inappropriate. *See Donovan v. Eaton Corp. Long Term Disability Plan*, 462 F.3d 321, 328 (4th Cir. 2006) (finding administrator's denial of plaintiff's claim was based on incomplete information, unreasonable and an abuse of discretion).

Although it is well established that it is the burden of the claimant, in a case such as this, to establish her disability, *Gable v. Sweetheart Cup Co. Inc.*, 35 F.3d 851, 855–56 (4th Cir. 1994), it is also well established that the plan administrator has a responsibility to provide a full and fair review of a claim for benefits. 29 U.S.C. § 1133 (stating that "every employee benefit plan shall . . . afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim"). From this Court's review of the record, it appears that Davis met her burden, but Hartford did not.

This Court is fully cognizant of the deferential substantial evidence standard of review applicable to the Court when it reviews an ERISA denial of benefits claim. Consistent with this deferential standard and considering the record as a whole, the Court must nevertheless ensure that the record contains some evidence beyond a mere scintilla that would allow reasonable minds to concur in the conclusion reached by Hartford. Mindful of this deferential standard, the record yields, at best, a mere scintilla of evidence to support

Hartford's decision that Davis' claim should be denied.[13]  Hartford's finding that

Davis was not entitled to a waiver of life insurance premiums was not reasonable

or the result of a deliberate, principled reasoning process, and it was not

supported by substantial evidence.  *See Berstein v. Capitalcare, Inc.*, 70 F.3d

783, 788 (4th Cir. 1995).  There is, however, substantial evidence in the record

for this Court to conclude that Davis is disabled according to the terms of the

Plan, the medical records, and applicable law.  Accordingly, the Court must

reverse Hartford's decision.

## V.    CONCLUSION

Based on the foregoing, it is the opinion of this Court that Defendant

Hartford abused its discretion in denying Plaintiff Davis' claim for waiver of life

insurance premium benefits.  Accordingly the decision of Defendant Hartford is

hereby **REVERSED.**

**IT IS THEREFORE ORDERED THAT** Defendant's Decision is **REVERSED** and

Summary Judgment is Granted in Favor of Plaintiff.

**IT IS SO ORDERED.**

G. Ross Anderson, Jr.
Senior United States District Judge

May _2_ , 2012
Anderson, South Carolina

---

[13] The Court notes that the majority of the records that Hartford specifically cited in its reasons
for denying Davis' claim were either misinterpreted by Hartford or were clearly misleading.

## <u>NOTICE OF RIGHT TO APPEAL DECISION</u>

Pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure, Petitioner has the right to appeal this Order within **thirty (30)** days from the date of its entry.  Failure to meet this deadline, as modified by Rule 4 of the Federal Rules of Appellate Procedure, **will waive the right to appeal.**